DAVID D. FISCHER, SBN 224900
LAW OFFICES OF DAVID D. FISCHER, APC
5701 Lonetree Blvd., Suite 312
Rocklin, CA 95765
Telephone:    (916) 447-8600
Fax:              (916) 930-6482
E-Mail:          david.fischer@fischerlawoffice.com

Attorney for Defendant
DENAE A. BELAND

DAVID W. DRATMAN, SBN 78764
ATTORNEY AT LAW
601 University Avenue, Suite 145
Sacramento, CA  95825
Telephone:    (916) 443-2000
Fax:              (916) 443-0989
E-Mail:          dwdratman@aol.com

Attorney for Defendant
BRIAN D. BELAND

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>        v.<br><br>BRIAN D. BELAND<br>DENAE A. BELAND,<br><br>              Defendants. | Case No.: 2:19-CR-00021 WBS<br><br>**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS WITH PREJUDICE**<br><br>DATE:<br>TIME:        9:00 a.m.<br>COURT:  Hon. William B. Shubb |

# TABLE OF CONTENTS

I.      SUMMARY ......................................................................................... 1

II.     STATEMENT OF FACTS.................................................................. 2

        A.      IRS Opens Civil Audit and Initiates Fraud Development Procedures.......... 2

        B.      IRS Interviews Defendants and Has a Second Discussion with
                CPA Prod'hon ........................................................................................ 7

        C.      IRS Discusses Criminal Strategy and Conceals Contact with
                CPA Prod'hon from Defendants ............................................................. 9

        D.      IRS Criminal Investigation Division Special Agent Instructs Civil
                Audit Team to Issue Summons to Elicit Specific Testimony ..................... 14

        E.      IRS Compels Appearance at Summons Interview ...................................... 16

        F.      Brian and Denae Attend Summons Interview............................................. 20

        G.      Tax Court Proceedings, Search Warrant, and Dismissal
                of Fraud Penalty ...................................................................................... 21

III.    ARGUMENT ..................................................................................... 23

        A.      IRS Used Fraud, Deceit, Trickery, and Misrepresentation to Gather
                Evidence To Incriminate Defendants....................................................... 28

        B.      IRS Civil Agents Continued Investigation After Developing
                Affirmative Acts of Fraud Instead of Referring Case to Criminal
                Investigation Division ............................................................................. 32

        C.      IRS Agents Conducted a Criminal Investigation Under the Guise
                of a Civil Audit ....................................................................................... 34

        D.      Grunewald Test Also Demonstrates Government Conducted the Civil
                Audit In Bad Faith In Violation of Defendants' Fourth and Fifth
                Amendment Rights.................................................................................... 36

        E.      IRS Violated Provisions of the Internal Revenue Manual and Other IRS
                Guidance Designed to Protect Constitutional Rights of Taxpayers............ 39

IV.     CONCLUSION ................................................................................... 41

# TABLE OF AUTHORITIES

**Cases**

*Beland v. Commissioner,*
 156 T.C. 80, 82 (2021) ...................................................................................passim

*Fargo v. Commissioner,*
 447 F.3d 706, 713 (9th Cir. 2006) ...................................................................25

*Greenberg's Express v. Commissioner,*
 62 T.C. 324 (1974) ...............................................................................................8

*Groder v. United States,*
 816 F.2d 139, 142 (4th Cir. 1987) ...................................................................25

*SEC v. Dresser Industries, Inc.,*
 628 F.2d 1368, 1376-1377 (D.C. Cir. 1980) ..................................................23

*United States v. Grunewald,*
 987 F.2d 531, 534 (8th Cir. 1993) ...............................................24, 25, 26, 34

*United States v. Horne,*
 714 F.2d 206, 207 (1st Cir. 1983) ...................................................................25

*United States v. Kordel,*
 397 U.S. 1, 11 (1970) .........................................................................................23

*United States v. Leahey,*
 434 F.2d 7, 10-11 (1st Cir. 1970) ....................................................................26

*United States v. McKee,*
 192 F.3d 535, 542 (6th Cir. 1999) .......................................................25, 28, 32

*United States v. Peters,*
 153 F.3d 445, 451 (7th Cir. 1998) ............................................................passim

*United States v. Piper,*
 681 F.Supp. 833, 837 (M.D.Ga.1988) .............................................................25

i

*United States v. Robson*,

477 F.2d 13, 17-18 (9th Cir. 1973) (citing similar rules in Second, Third, and

Fifth Circuits) ......................................................................................................23

*United States v. Stringer*,

535 F.3d 929, 936-937 (9th Cir. 2008)........................................23, 24, 30, 38

*United States v. Tweel*,

550 F.2d 297 (5th Cir. 1977) .........................................................................27, 40

*United States v. Wadena*,

152 F.3d 831, 854 (8th Cir.1998) ........................................................................25

**Statutes and Regulations**

I.R.C. § 7212(1) ...........................................................................................................1

16 Cal. Code Regs. § 54.1 ...........................................................................................9

I.R.C. § 6214(a) ...........................................................................................................8

I.R.C. § 6501(a) ...........................................................................................................7

I.R.C. § 6501(c)(1) .....................................................................................................14

I.R.C. § 6501(c)(4) .......................................................................................................7

I.R.C. § 7205 ................................................................................................................9

I.R.C. § 7525(a) ...........................................................................................................9

I.R.C. § 7602(c)(2) .......................................................................................................9

I.R.C. §§ 6212, 6213 ..................................................................................................19

**Other Authorities**

IRM 25.1.1.1.3 (04-23-2021) ...................................................................................5, 6

IRM 25.1.1.4 (04-22-2021) .........................................................................................36

IRM 25.1.2.1.1(1) (04-23-2021)...................................................................................6

IRM 25.1.2.2(6) (04-24-2014)........................................................................15, 16, 27

IRM 25.1.2.2(6) (06-09-2015)......................................................................................15

IRM 25.1.6.2(1) (06-10-2021)....................................................................................5, 6

IRM 25.27.1.4(2) (04-07-2021) ................................................................ 12

IRM 25.27.1.6(2)(d) (04-07-2021) ........................................................... 12

IRM 25.5.6.5.2(3) .................................................................................. 27

IRM 25.6.1.9.5.2 (10-01-2010) ............................................................... 14

IRM 4.10.3.3.5(3) (02-26-2016) ......................................................... 30, 31

IRM 4.10.9.5(4) (08-11-2014) ................................................................. 12

IRM 4.10.9.7.7(1) (08-11-2014) ........................................................ 12, 40

IRM 4.10.9.7.9(3) (08-11-2014) .............................................................. 40

IRM 4.16.1.3.2 (06-14-2011) ....................................................... 30, 31, 40

IRM 4.23.9.6.2(2) (05-14-2008) .............................................................. 27

IRM 4.71.25.2 (11-22-2019) ................................................................... 39

IRM 4.71.25.2(16) (3-19-2014) ............................................................... 27

IRM 8.4.1.7 ............................................................................................. 8

IRS Chief Counsel Memorandum,

    FTA's Role in Civil and Criminal Investigations, available online at

    https://www.irs.gov/pub/lanoa/pmta01123_7321.pdf (last visited Feb. 7, 2022) ........... 6

Public Law (P.L.) 105-206 § 1203(b)(4) ...................................................... 12

## MEMORANDUM OF POINTS AND AUTHORITIES

The government obtained an indictment charging defendant Brian Beland with three counts of Making and Subscribing a False Tax Return (I.R.C. § 7206(1)[1]), and charging both Brian and Denae Beland with Corruptly Endeavoring to Impede the Due Administration of the Internal Revenue Laws (I.R.C. § 7212(1)).

As is set forth below, this case should be dismissed with prejudice, as the government violated the defendants' Fourth and Fifth Amendment rights.   In the alternative, all evidence obtained by the IRS beginning in November 2014 should be suppressed.

## I.    SUMMARY

This case should be dismissed with prejudice because the IRS criminal and civil agents acted in bad faith through the use of fraud, deceit, trickery, and misrepresentation in violation of the Fourth and Fifth Amendments throughout the course of an income tax audit.  The IRS conducted a criminal investigation under the guise of a civil audit,[2] working directly with the IRS Criminal Investigation Division ("CI").

The IRS civil revenue agents acted on behalf of and at the direction of CI, and employed civil investigation tools, such as the administrative summons, to gather evidence solely for the purpose of obtaining evidence for the criminal investigation and prosecution. As the United States Tax Court has recently held in the related civil proceeding, "[u]pon the request of the IRS Criminal Investigation Division" the civil revenue agents personally served a civil summons on the defendants "to obtain information concerning petitioners' knowledge as to bank information and third party records."  *Beland v. Commissioner*, 156 T.C. 80, 82 (2021) (holding that the IRS revenue agent violated I.R.C. § 6751(b) and finding the civil fraud penalty cannot be assessed).

---

[1] Unless otherwise noted, all section references to "I.R.C." are to the Internal Revenue Code in effect for the relevant times.

[2] In this motion we use "civil audit" to refer to the civil income tax examination, though the IRS and case law often refer to an audit as an "examination." The two terms are synonymous.

When the defendants asked the IRS which third-parties had been contacted pursuant to I.R.C. § 7602(c), the IRS agents concealed a significant witness: a certified public accountant to whom Denae had previously divulged confidential and privileged information. The IRS civil revenue agents[3] concealed this witness by purposely not writing a memorandum of interview after holding at least two off-the-record witness interviews, by intentionally failing to record or deleting all written references of that witness and her statements from the civil administrative file, and by keeping notes from the witness interview in a secret file to ultimately turn over to CI after concluding the civil audit. That witness's statement appeared verbatim from the IRS notes in CI's search warrant application.

The IRS's conduct violated Brian and Denae's Fourth and Fifth Amendment rights along with important Internal Revenue Manual provisions designed to protect those rights. In light of the government's bad faith, this case should be dismissed. In the alternative, all evidence obtained by the IRS beginning in November 2014 should be suppressed.

Filed concurrently with and in support of the motion to dismiss are documents from the IRS administrative files, documents filed in Brian and Denae's Tax Court proceeding, copies of historical Internal Revenue Manual provisions, and other relevant items. Also filed in support of the motion to dismiss is a declaration of CPA Guy Black ("CPA Black"), who was Brian and Denae's tax representative during the income tax audit.

## II.     STATEMENT OF FACTS

### A.     IRS Opens Civil Audit and Initiates Fraud Development Procedures

In or around October 2014, the IRS selected Brian and Denae Beland's 2012 Form 1040 (U.S. Individual Income Tax Return) for a civil income tax examination ("civil audit"). Group Manager Gabriel Pardo ("GM Pardo") supervised the civil audit. Exhibit A

---

[3] Civil IRS agents are known as "Revenue Agents," whereas criminal agents are known as "Special Agents."

2

(copy of a Form 9984 (Examining Officer's Activity Record)[4] that GM Pardo used to document contacts and activities for the civil audit).

GM Pardo assigned the civil audit to IRS Revenue Agent Ivana Raymond ("RA Raymond") on October 8, 2014.  Exhibit A, at 3.  RA Raymond's Activity Record, submitted as Exhibit B, is important in this case because it illustrates RA Raymond's deliberate concealment of her team's contacts with CPA Terrie Prod'hon ("CPA Prod'hon"), a key witness CI Special Agent Jason Lamb later used in the IRS probable cause statement.  Exhibit F, at 8-9.

On October 30, 2014, RA Raymond notified Brian and Denae that the IRS had opened a civil audit, and scheduled an initial response deadline of November 13, 2014. Exhibit B, at 1-2.  Denae contacted tax professionals about assisting with the civil audit, including CPA Prod'hon.  Exhibits C and D.  Denae gave CPA Prod'hon her tax return and the IRS letter, had a conversation with her, but ultimately did not engage her.  Exhibits C and D.

Shortly after speaking with Denae, CPA Prod'hon called RA Raymond without authorization or a power of attorney (IRS Form 2848) and discussed the 2012 tax return. According to Group Manager Andrew Drysdale's ("GM Drysdale") memorandum of contact with Special Agent Jason Lamb, CPA Prod'hon is alleged to have stated that Brian and Denae "came up with" some of the figures on their tax returns.  Exhibit E.  While that language is ambiguous, it is later used verbatim in the search warrant application ("they came up with the figure"), and the IRS clearly infers in the search warrant application that this means "made up" or "fabricated."  Exhibit F.  Regardless of CPA Prod'hon's intended meaning, the IRS civil audit team considered her statements to be significant, and they launched formal fraud development procedures before ever meeting with Brian and Denae.

---

[4] Internal Revenue Manual (IRM) 4.10.9.5(1) (08-11-2014) describes the audit Activity Record, or Form 9984, as follows: "Form 9984, indexed as Lead Sheet 100, should be used to document each action taken on the case. The activity record should be prepared contemporaneously and provide a complete and concise case history. Form 9984 chronicles all actions on the part of the examiner, group manager, clerical support staff, taxpayer and/or the taxpayer's representative, etc. during the course of the audit."

Brian and Denae ultimately retained CPA Guy Black ("CPA Black") to represent them in the civil audit. On November 13, 2014, CPA Black faxed in a power of attorney (IRS Form 2848). Exhibit B, at 1-2. On November 18, 2014, RA Raymond sent a letter stating the initial audit appointment would be on December 10, 2014, and enclosed an "Information Document Request" ("IDR No. 1") requesting various records relating to Brian and Denae's 2012 Form 1040. Exhibit G.

On December 5, 2014, CPA Black requested a postponement of the December 10 appointment. Exhibit H. CPA Black provided several doctors' notes explaining that Denae was in her first trimester of a high risk pregnancy, and that due to an anxiety disorder, there was concern that the added stress of a tax audit could cause potential harm to the unborn child during the first trimester. Exhibit H.

RA Raymond refused to reschedule, and CPA Black informed her that he would still appear with whatever information he had, stating in relevant part as follows:

From my understanding, your position is:

- Not to delay tomorrow's meeting for a few weeks even though we have given you written documentation stating one of the taxpayers has a health condition that is hindering proper preparation for the audit.

- Mr. Beland needs to be available for questions regarding the business or you may take such action as an administrative summons or other tactics to force compliance.

* * *

- Approximately 11 business days from the time the taxpayer and representative received Form 4564 is a reasonable amount of time to gather all the information you have requested from third parties and for the taxpayer's representative to gain an understanding of everything on the 2012 tax return.

Although it has been stated I have not had time to be properly prepared for the audit, I will be at the 11am meeting to answer any questions to the best of my knowledge and to give you any documentation the taxpayers have available.

Exhibit I (cleaned up).

CPA Black appeared in person on December 10, 2014, with some of the requested information and documents and participated in an audit interview. Exhibit B, at 3. After the appointment, RA Raymond issued IDR No. 2 with a deadline of January 21, 2015; she opened up tax years 2011 and 2013 for audit; issued IDR No. 3 to Brian and Denae; and issued a separate IDR No. 4 to Brian. Exhibit B, at 3.

The same day as the appointment with CPA Black, RA Raymond contacted Fraud Technical Advisor Jaymal Damodar ("FTA Damodar") to initiate "fraud development" procedures. Exhibit B, at 3-4. Because RA Raymond either did not record or deleted notes of her conversation with CPA Prod'hon, it is not clear whether the fraud development procedures were initiated before or after that conversation. Where an IRS revenue agent and group manager agree there are "indicators of fraud," IRS fraud development procedures require the revenue agent to contact a "Fraud Technical Advisor" ("FTA") to develop the case for fraud. IRM 25.1.6.3(1) (06-10-2021). An FTA, now known as a "Fraud Enforcement Advisor,"[5] has the following job description:

> The fraud enforcement advisor (FEA) plays a vital role in the development of a potential fraud case. The FEA will be consulted in all cases involving potential criminal fraud, as well as those cases that have potential for a civil fraud penalty. The FEA is available to assist in fraud investigations and offer advice on matters concerning tax fraud. Upon initial recognition of indicators of fraud, the employee will discuss the case at the earliest possible opportunity with his/her manager. If the compliance group manager concurs, the FEA will be contacted immediately through the Specialist Referral System, and both the compliance group manager and FEA will provide guidance to the compliance employee on how to proceed. Compliance managers will encourage the early involvement of the FEA in all potential fraud cases. Local area counsel is also available for consultation and advice when badges of fraud are first identified.

IRM 25.1.6.2(1) (06-10-2021).

---

[5] A "Fraud Technical Advisor," now known as a "Fraud Enforcement Advisor," serves as a resource and liaison to compliance employees in all operating divisions. IRM 25.1.1.1.3 (04-23-2021) (see Manual Transmittal dated April 22, 2021, describing references to FTA being replaced with "FEA" throughout the IRM). The FEA is available to assist in fraud investigations and offer advice on matters concerning tax fraud. *Id.*

The IRS has acknowledged the sensitive constitutional issues associated with the FTA's role in civil and criminal investigations.  *See* IRS Chief Counsel Memorandum, FTA's Role in Civil and Criminal Investigations, available online at https://www.irs.gov/pub/lanoa/pmta01123_7321.pdf (last visited Feb. 7, 2022).  In this Chief Counsel Memorandum, the IRS notes that "[t]he dual investigative process and the inherent problem of dividing civil and criminal responsibilities within a single federal agency present delicate boundaries in permissible conduct between the two functions in developing fraud cases."  Similarly, the IRS notes that "revenue agents and officers as well as the FTAs who advise them must walk a fine line between vigorous investigation and overzealous, and even unconstitutional, investigations."

On December 12, 2014, RA Raymond and GM Pardo had a phone conference with FTA Damodar.  Exhibit B, at 4.  During this phone conference, the civil audit team decided Brian would have to appear for questioning at the January 21 appointment, and that they would compel his appearance through an administrative summons if necessary.  Exhibit B, at 4.  RA Raymond called CPA Black to request that Brian appear in person for the January 21 appointment, which Brian agreed to do.  Exhibit B, at 4-5.

Where a group manager and FTA agree to put a case into formal fraud development status, they must prepare a Form 11661 (Fraud Development Recommendation – Examination) and the case will be updated on IRS internal systems to "status code 17" (known internally as "Fraud Development" status).  IRM 25.1.6.3(3) (06-10-2021).  On December 16, 2014, GM Pardo and FTA Damodar completed and signed a Form 11661.  Exhibit J.  The Form 11661 indicates that the "basis for the suspected fraud" was "false expenses/deductions."  The next day, the IRS formally updated the case to status 17, "Fraud Development status."  Exhibit K.  As is discussed below, the IRS distinguishes between "first indicators (or badges) of fraud" and "affirmative acts (firm indications) of fraud."  IRM 25.1.2.1.1(1) (04-23-2021).  The IRS should not use Fraud Development procedures where the civil auditors believe there are "affirmative acts of fraud" or firm indicators of fraud," and instead those cases should be referred to CI.  IRM 25.1.2.2(8) (04-23-2021).

At this early stage, RA Raymond had already characterized CPA Black and the defendants as being "uncooperative throughout the audit," and had already determined that Brian and Denae had been filing false Schedule C (sole proprietorship) losses "by deducting fabricated expenses." Exhibit L, at 1. Over the next eight months, RA Raymond, GM Pardo, and FTA Damodar used civil audit procedures to gather proof for a criminal case in bad faith under the guise of a civil audit, utilizing deceit, fraud, trickery, and affirmative misrepresentations.

## B.   IRS Interviews Defendants and Has a Second Discussion with CPA Prod'hon

On December 23, 2014, FTA Damodar sent RA Raymond an email listing questions for her to ask in the interview to begin developing the criminal referral.  Exhibit K.  On January 21, 2015, Brian and Denae appeared for the initial interview with CPA Black, GM Drysdale, and RA Raymond in attendance.  Exhibit B, at 5-6.  During the interview, RA Raymond provided a Form 872 (Consent to Extend the Time to Assess Tax) to Brian and Denae to request that the statute of limitations on assessment be extended for tax year 2011. Exhibit B, at 6.  The IRS generally has three years from the date a tax return is filed to assess additional tax or penalties.  I.R.C. § 6501(a).  During civil audits IRS and taxpayers may agree to extend the normal three-year statute by signing a Form 872, which extends the statute for a specified period.  I.R.C. § 6501(c)(4).  As is noted throughout the discussion below, the civil audit team was very interested in persuading Brian and Denae to sign a statute extension to give the civil audit team more time to develop its fraud referral for CI without the constraint of a looming civil assessment statute expiration date for tax year 2011.

During the interview, RA Raymond falsely stated that there would be no appeal rights if Brian and Denae did not sign the Form 872.  Exhibit M, at 2.  The Tax Court held that an identical statement by RA Raymond at a subsequent interview concerning appeal rights was "incomplete and potentially misleading."  *Beland v. Commissioner*, 156 T.C. 80, 89 (2021).  RA Raymond also falsely stated during the interview that "no new

information would be considered in an appeal." Exhibit M, at 3 [CPA Black letter 2/4/2015 at 3]; *see* I.R.C. § 6214(a), *Greenberg's Express v. Commissioner*, 62 T.C. 324 (1974) (citing the longstanding proposition that a Tax Court proceeding to redetermine a tax deficiency is *de novo* and taxpayers may introduce new information in an appeal); see also IRM 8.4.1.7 (describing procedure for IRS Appeals Office following the filing of a Tax Court petition). CPA Black stated that his impression was that RA Raymond was trying to pressure Brian and Denae into signing the statute extension:

> During this meeting, RA Raymond provided a statute of limitations extension (IRS Form 872) for tax year 2011, and said that if we did not sign the Form 872, the taxpayers would not have appeal rights. RA Raymond also said that even if Brian and Denae were to appeal the case, no new information would be considered in such an appeal. My impression was that RA Raymond was saying these things to pressure Brian and Denae to sign the Form 872 for tax year 2011.

Black Decl., ¶ 24.

Despite RA Raymond's efforts to persuade Brian and Denae to sign the Form 872, they declined. Exhibit B, at 5. RA Raymond considered this refusal to be an "attempt to hinder the examination," and she even listed it as a badge of fraud in support of the civil fraud penalty, despite that the IRS's own Form 872 states the taxpayer "has the right to refuse to extend the period of limitations." Exhibit N, at 7; Exhibit O. The day following the interview, RA Raymond sent another copy of the statute extension for tax year 2011 by mail to Brian and Denae, along with IDR No. 4 with a due date of February 6, 2015. Exhibit O, at 3; Exhibit B, at 6.

It was at about this time that CPA Prod'hon spoke to the IRS a second time regarding Brian and Denae's tax returns, this time with Group Manager Andrew Drysdale ("GM Drysdale"). According to a memorandum of interview, "Prod'hon contacted supervising RA Andrew Drysdale to inform him of the meeting [with Denae] and let him know that Beland did not appear to intend on amending the returns." Exhibit C. CPA Prod'hon is alleged to have stated during this discussion that Brian and Denae "came up with" some of the numbers or figures on their tax returns. Exhibit E. According to the memoranda of

contact, GM Drysdale and CPA Prod'hon discussed technical details of the tax returns (*e.g.*, "putting rental properties on Schedule C rather than Schedule E"), as well as CPA Prod'hon's impressions of the returns and audit strategy (*e.g.*, "she had demanded a $5,000 retainer to accept" the case and prepare amended returns).  Exhibit P; Exhibit E.

Thus, by early February 2015, two different IRS agents had spoken with CPA Prod'hon in detail concerning confidential and privileged information relating to Brian and Denae's tax returns.  *See* 16 Cal. Code Regs. § 54.1 (California CPA regulations, "Disclosure of Confidential Information Prohibited," which extends to potential clients); *see also* I.R.C. § 7525(a) (limited federal tax professional privilege).

On February 4, 2015, CPA Black was clearly concerned with the direction of the audit and sent a letter requesting a list of all IRS contacts with third-parties.  Exhibit M; s*ee* I.R.C. § 7602(c)(2) (requiring that the IRS provide a record of persons contacted during an audit upon request of the taxpayer).  The next day, RA Raymond met with GM Drysdale and FTA Damodar to discuss the letter requesting the third-party contacts.  Exhibit B, at 7.

As discussed below, the civil audit team decided to conceal their conversations with CPA Prod'hon, and falsely informed Brian and Denae that they had not spoken with CPA Prod'hon in response to CPA Black's request for a list of all third party contacts.  The civil audit team made a conscious decision to keep its discussions with CPA Prod'hon secret until the criminal referral to CI was finalized, at which point the IRS turned over secret notes to CI Special Agent Jason Lamb.

## C.   IRS Discusses Criminal Strategy and Conceals Contact with CPA Prod'hon from Defendants

Internal emails show that the IRS had clearly begun strategizing for the criminal investigation at around the time of the interview with Brian and Denae.  For example, on February 6, 2015, FTA Damodar emailed RA Raymond, GM Pardo, and GM Drysdale to draw their attention to a Title 26 criminal violation related to filing false or fraudulent withholding exemption certificates (I.R.C. § 7205).  RA Raymond acknowledged the Title 26 criminal violation references by stating, "Good to know, thanks."  Exhibit Q.   These

emails were not part of the civil audit file, and were only provided to Brian and Denae pursuant to a FOIA request for electronically stored information.  The audit file has no trace of CPA Prod'hon or the civil audit team's coordination with CI.

A few days later, after CPA Black had requested a list of all third-party contacts, the civil audit team discussed what to do about CPA Prod'hon under the email subject line "Title 26 Criminal Violation."  Exhibit R, at 1.  There is conflicting information in the government's memoranda of interview as to when GM Drysdale actually spoke to CPA Prod'hon.  In one memorandum of contact, GM Drysdale claims to have spoken to CPA Prod'hon regarding an unrelated tax audit of one of CPA Prod'hon's clients at some unknown time between January 21, 2015 (the date of the interview), and February 12, 2015 (the date FTA Damodar instructed the civil audit team not to memorialize the discussion with CPA Prod'hon).  Exhibit P.  GM Drysdale could not remember the exact date of his communication with CPA Prod'hon because, as discussed below, FTA Damodar told him not to write down that conversation.  Exhibit R.

However, GM Drysdale's proposed timeline conflicts with CPA Prod'hon's statement to IRS Special Agent Jason Lamb that she spoke to GM Drysdale "shortly after her interaction with Beland" to inform him of her recent meeting with Denae.  Exhibit C.  That would have placed the conversation with GM Drysdale in November 2014.  From CPA Prod'hon's memorandum of contact, it is more likely that she is talking about her initial discussion with RA Raymond in or around November 2014.

The exact dates of these discussions with CPA Prod'hon are not clear because the IRS decided to keep their discussions secret until the criminal referral was completed.  Clearly the IRS deemed CPA Prod'hon's testimony to be significant, given that GM Drysdale's post-it notes from their discussion were used verbatim ("came up with" the figures) in the search warrant application.  On or about February 12, 2015, FTA Damodar spoke to IRS Counsel attorney Christian ("Chris") Speck about GM Drysdale's discussion with CPA Prod'hon, which FTA Damodar explains:

> I spoke to council [sic] in regards to the CPA.  Chris says not to contact the CPA at all.  However, you need to document in the activity record what has occurred and

add on that a discussion with Chris Speck was made in regards to contacting the CPA but advised not to contact. I believe if it goes to tax court, the CPA will be summonses [sic] as a witness to testify. If we contact her, we could have several potential issues.

Exhibit R. The "CPA" referenced in this email is CPA Prod'hon, rather than CPA Black (*e.g.*, FTA Damodar uses the pronoun "her").

RA Raymond replied to FTA Damodar: "Thank you for the follow up. Andrew [Drysdale] will be writing up a memo for the case file regarding the discussion with the CPA and I will document the discussion with Chris Speck." Exhibit R, at 1. However, FTA Damodar did not want the discussion with CPA Prod'hon memorialized, and responded that "I would not advice [sic] to have a memo regarding the discussion. You simply going to note it but will not act on the CPA's action. Please be careful." Exhibit R, at 1.

RA Raymond chose not to "note" the discussions with CPA Prod'hon in her Activity Record or anywhere else in the administrative files. Exhibit B. Quite the opposite, RA Raymond studiously omitted any trace of CPA Prod'hon from the civil record altogether. The sole contemporaneous reference to CPA Prod'hon only turned up after Brian and Denae submitted a FOIA request for electronically stored information on January 14, 2019. Exhibit B.

Additionally, instead of writing up the witness memorandum as planned, GM Drysdale kept his handwritten post-it notes from the discussion in a secret location outside of the civil audit file. Exhibit S, at 1-2. After the civil audit was closed, GM Drysdale gave the post-it notes to Special Agent Jason Lamb on February 24, 2016. Exhibit S, at 1-2. The phrase "came up with" that appears on these post-it notes later made its way into the search warrant application verbatim. Exhibit F.

The civil audit team's decision to conceal a highly material discussion with a key witness by purposely not memorializing it, and then to keep evidence of that discussion out of the civil record altogether, is outrageous and illustrates the government's bad faith in this case. RA Raymond and GM Drysdale's decision to omit the discussions with CPA

11

Prod'hon is in clear contravention of the Internal Revenue Manual. IRM 4.10.9.5(4) (08-11-2014) (requiring that contact with all third-parties be maintained in the Activity Record). RA Raymond concealed the discussions with Prod'hon by not describing it anywhere in the Activity Record, civil audit workpapers, or the Civil Fraud Penalty Lead Sheet where an obviously material statement from a key third-party witness is also required. IRM 4.10.9.7.7(1) (08-11-2014); Exhibit N. Further, Public Law (P.L.) 105-206 § 1203(b)(4) provides that it is an act of employee misconduct to falsify or destroy documents to conceal mistakes made by any employee. If it was a mistake for the IRS to have multiple discussions about Brian and Denae's tax returns with CPA Prod'hon, the falsification of the Activity Record to hide such discussions constitutes employee misconduct under P.L. 105-206 § 1203(b)(4).

Rather than put notes from the discussions with CPA Prod'hon in the civil audit file as required, the civil audit team reserved this information for special use in the criminal referral that they were developing. As is noted above, CPA Prod'hon's statements recorded on GM Drysdale's post-it notes appeared verbatim in the affidavit in support of the search warrant application ("came up with" the figure). The IRS considered her remarks to be so material that CPA Prod'hon was the only third-party witness quoted in the statement of probable cause. Exhibit F, at 7-8.

Equally as significant as keeping secret notes, RA Raymond made sure that Brian and Denae would not find out about the discussion with CPA Prod'hon when the IRS responded to CPA Black's request for the list of third-party contacts. IRM 4.11.54.4.1(1) provides that when a third-party is contacted, the IRS examiner must record the contact using Form 12175. *See also* IRM 25.27.1.4(2) (04-07-2021). IRM 25.27.1.4(2) (04-07-2021) provides that the IRS revenue agent must send the completed Form 12175 to the Area/Campus Third-Party Coordinator as soon as possible after it is completed. The Third-Party Coordinator then enters the data from the Form 12175 into the Third Party Coordinator Command Code database. IRM 25.27.1.6(2)(d) (04-07-2021). The assigned revenue agent is responsible for following these requirements. *Id*.

While RA Raymond followed the third-party contact procedure with respect to her contact with New Dimensions, Inc., she chose to conceal the discussions with CPA Prod'hon. Exhibit B, at 3. On February 27, 2015, RA Raymond emailed IRS Third-Party Contact Coordinator representative George Pritchard about CPA Black's February 4 request for a list of third parties that the IRS had contacted. Exhibit T. In the email, RA Raymond falsely informed George Pritchard "[o]nly one third party was contacted," and refers to the Form 12175 previously submitted concerning New Dimensions, Inc. Exhibit T, at 1. RA Raymond did not tell George Pritchard that GM Drysdale very recently had a detailed discussion with CPA Prod'hon about Brian and Denae's tax returns.

On February 27, 2015, the IRS sent a Letter 3173 to Brian and Denae in response to CPA Black's February 4 request for third-party contacts:

> In response to your request, we are providing you with the following name(s) of the third party(ies) we contacted to help us correctly determine or collect your tax liability. We may or may not have obtained information during these contacts. We are providing this information to you in accordance with Section 7602(c)(2) of the Internal Revenue Code, which becomes effective for third party contacts made after January 18, 1999.

Exhibit U.

As RA Raymond had ensured, the list enclosed with Letter 3173 omitted CPA Prod'hon's name, and falsely indicated that the IRS had only contacted New Dimensions, Inc. Exhibit U, at 2. RA Raymond's intentional omission of a material witness, who possessed confidential information and had engaged in privileged communications, was deceitful and prejudicial to Brian and Denae. Any taxpayer would expect that discussions with a prospective CPA about IRS audit representation would remain confidential and privileged. By concealing the IRS's discussions with CPA Prod'hon, the civil audit team successfully tricked Brian, Denae, and CPA Black, who lost an important opportunity to evaluate and make informed decisions as to whether and how to respond to future IRS requests for information and how to respond questioning at the later summons interview, if at all. CPA Black stated that "[h]ad the IRS informed

me . . . that RA Raymond or one of the group managers had spoken with CPA Prod'hon, I would have advised Brian and Denae that the IRS had likely received confidential and privileged information about their tax returns, and I would have referred them to an attorney." Black Decl, ¶ 30.

On March 6, 2015, CPA Black informed RA Raymond that the IRS may be overreaching, and requested another list of third-party contacts with additional information concerning the contacts. Exhibit V. The IRS did not provide additional third-party contacts following this letter. Entire record.

### D. IRS Criminal Investigation Division Special Agent Instructs Civil Audit Team to Issue Summons to Elicit Specific Testimony

With a looming statute expiration date of October 16, 2015, the civil audit team was under pressure to close the 2011 audit. IRS Territory Manager Sheryl Parker later admonished the civil audit team for running up so close to the statute expiration date, stating, "Truly this is too close for comfort. Going forward please make certain you ensure statutes are extended or closed within 120 days of the statute date." Exhibit W.

Instead of closing it out, FTA Damodar emailed IRS Counsel about relying on an extended statute due to his belief that there were "several affirmative acts of fraud." Exhibit X, at 4. Requests for permission to rely upon the extended fraud statute under I.R.C. § 6501(c)(1) must be reviewed and approved by IRS Counsel. IRM 25.6.1.9.5.2 (10-01-2010). I.R.C. § 6501(c)(1) provides that there is no statute of limitations on assessment if civil fraud is present. On April 24, 2015, RA Raymond sent a memorandum requesting IRS Counsel approval for the extended fraud statute of limitations. Exhibit Y.

When the IRS believes there are "affirmative acts of fraud," as FTA Damodar believed at this stage, the civil function is supposed to suspend all activity and refer the case to CI, as is discussed below. However, the civil audit team wanted more time on the statute so that it could "continue to develop" the case for CI. GM Pardo later admitted that the civil audit team had been developing this case for the benefit of CI, noting that if the extended fraud statute was approved, "then we can continue to develop the earlier year

14

(201112) and <u>proceed with the F2797 CI Referral</u>."  Exhibit Z (emphasis added); see also Exhibit B, at 13 (purpose of the memo was "statute protection").  A few days later, GM Pardo again called CPA Black about the statute extension.  Exhibit A, at 1.  On May 19, 2015, the civil audit team met to discuss the "eminent [sic] statute," meaning the 2011 statute.  Exhibit A, at 1; Exhibit B at 15.

At some uncertain time before June 5, 2015, the civil audit team had a discussion with an unknown CI Special Agent or Special Agents about developing the criminal referral.  Exhibit X, at 1.  The unknown CI Special Agent or Special Agents instructed the civil audit team to issue an administrative summons to Brian and Denae to compel their appearance for testimony regarding specific information that CI deemed relevant.  Exhibit X, at 1; *Beland v. Commissioner*, 156 T.C. 80, 82 and n.2 (2021).

On June 5, 2015, a few weeks before Denae's due date (the IRS was aware that Denae was nine months into a high-risk pregnancy at this time), GM Pardo and RA Raymond showed up unannounced at Brian and Denae's house and personally served two administrative summonses.  Exhibit B, at 15-16.  The summonses required their appearance at the local IRS office on June 30, 2015, and contained generic language as to the purpose of the summons, citing various Internal Revenue Code provisions concerning summons authority, and describing the consequences for failure to appear, such as monetary sanctions and <u>imprisonment</u>.  Exhibit AA.  The summons did not disclose that the interviews were intended to be used for criminal purposes, or that Brian and Denae could decline to answer questions pursuant to the Fifth Amendment's protection against compelled self-incrimination.  Exhibit AA.

Where the IRS discovers "affirmative acts of fraud," the IRS civil function must suspend all activity.  IRM 25.1.2.2 (6) (04-24-2014) provides that, "[I]f affirmative acts of fraud are established," "(a) <u>The compliance employee must suspend collection or examination activity</u>, and immediately notify the group manager and the FTA."  IRM 25.1.2.2(6) (04-24-2014); IRM 25.1.2.2(6) (06-09-2015); *see* Exhibit BB (historical IRM

25.1.1.2 in effect during the span of the civil audit, note that it was updated as of June 9, 2015).

The instructions on RA Raymond's Lead Sheet 205 (Fraud Development) in the audit file similarly state that where there are "affirmative acts of fraud," the IRS civil audit must "suspend all activity." Exhibit CC. Lead Sheet 205 further instructs "[w]here affirmative acts of fraud/willfulness exist and criminal criteria are met, refer the case to Criminal Investigation via Form 2797." Further, Lead Sheet 205 instructed RA Raymond that, "No actions should be taken until Criminal Investigation accepts or declines referral." Exhibit CC, at 2. If accepted, cases should be updated to "status 18." Exhibit CC, at 2. If not accepted by CI, civil fraud consideration should be pursued. Exhibit CC, at 2. The IRM specifically states that the IRS civil function must not coordinate efforts with CI: "**Warning: The compliance employee or the compliance employee's group manager must never seek advice from CI for a specific case under examination/collection activity**." Exhibit BB (IRM 25.1.2.2(6) (04-24-2014)) (bold in original). In summary, where there are affirmative acts of fraud or firm indications of fraud, the civil audit team is required to suspend all examination activity, refer the case to CI, and not to seek advice from CI about how to develop the case.

By consulting directly with CI and receiving instructions on how to proceed with respect to the summons to obtain specific information that CI deemed relevant, the IRS ignored the prohibition on coordinating with CI as set forth in the IRM and in Lead Sheet 205. At this stage, the civil audit team considered itself to be developing the case for CI. Exhibit Z (noting that his team had been developing the case for the CI referral).

### E.  IRS Compels Appearance at Summons Interview

On June 23, 2015, CPA Black informed RA Raymond that Brian and Denae could not appear for the summons interview because Denae had just given birth. Exhibit DD.

The next day, CPA Black requested that the interview be rescheduled until after August 17, 2015, after she was estimated by a doctor to be no longer incapacitated. Exhibit

EE.  RA Raymond characterized these requests to reschedule the summons interview as attempts "to obstruct the examination by failing to comply with the summonses to appear until compelled by force."  Exhibit  N, at 6.  She also accused Denae of using "her pregnancy throughout the examination to delay the audit."  Exhibit N, at 7.

On June 26, 2015, GM Pardo left a voicemail for CPA Black.  CPA Black Decl., Exhibit A.  In the voicemail, GM Pardo again asked for a consent to extend the statute of limitations, and pressured CPA Black by stating that if he did not hear back the IRS would issue an audit report with a "disallowance of all expenditures."  The same day, CPA Black sent a letter to GM Pardo asking for a written response about Brian and Denae's request to reschedule the summons interview.  Exhibit FF.

On June 29, 2015, CPA Black sent a letter to GM Pardo stating that due to the formal nature of the summons, all future communications would be in writing.  Exhibit GG.  CPA Black again informed GM Pardo that Brian and Denae declined the request to sign a statute extension.

With time running out, the civil audit team had only a few months left to develop the criminal referral before the 2011 statute expired, and so Denae's recent childbirth was a major obstacle for the civil audit team.  On June 30, 2015, GM Pardo emailed IRS Counsel Blaine about Brian and Denae's request to reschedule the summons interview until after August 17, 2015, due to her incapacity.  Exhibit X.  In this email, as is noted above, GM Pardo acknowledges that the civil audit team had previously coordinated efforts with CI, and that an unknown CI Special Agent had asked the civil audit team to serve Brian and Denae with a civil administrative summons to obtain specific information:

> We chose to issue an Administrative Summons upon the request of CI and our FTA so that we could determine both or either parties' extent of knowledge concerning certain bank information and other 3rd party records which we received from prior summons.

Exhibit X, at 1 (emphasis added); *Beland v. Commissioner*, 156 T.C. 80, 82 and n.2 (2021).

The Tax Court acknowledged CI's influence in directing the civil audit team at this stage in its recent opinion, finding that, "Upon the request of the IRS Criminal Investigation

Division and the FTA, GM Pardo and RA Raymond issued an administrative summons to petitioners on June 5, 2015, to appear before RA Raymond again on June 30, 2015." *Beland v. Commissioner*, 156 T.C. 80, 82 (2021).  The Tax Court further noted that "internal e-mail correspondence between respondent's counsel and GM Pardo shows that the summons was issued at least in part 'to obtain information concerning petitioners' knowledge as to bank information and third party records.'"  *Id*. at 82, n.2.  The instruction to obtain that information came from the unknown CI Special Agent or Special Agents.

It is evident from GM Pardo's voicemail (Guy Black Decl., ¶ 37) that as far as the civil audit was concerned, his team was content to simply disallow Brian and Denae's business deductions and issue an audit report with tax and penalties.  GM Pardo viewed such a course of action as a way to pressure Brian and Denae to appear after Denae's childbirth:

> Do we have the option to issue an Audit Report with the Civil Fraud Penalty?  We are certain that the taxpayers will respond immediately upon receipt since the tax liability will be about a half a million dollars for three years.

Exhibit  X, at 1.  Similarly, in a later email to IRS Counsel Blaine, RA Raymond asked "Also, can we issue the [revenue agent report] with the civil fraud penalty?"  Exhibit HH.

While the civil audit team had already committed to asserting <u>civil</u> fraud penalties, they continued the investigation for the purpose of developing the criminal case for CI.  Exhibit  Z ("[T]hen we can continue to develop the earlier year (201112) and proceed with the F2797 CI Referral.")

On July 17, 2015, RA Raymond sent IRS Counsel Blaine draft audit reports for all three years including fraud penalties.  Exhibit B, at 18.  These audit reports with fraud penalties were prepared over a month before the summons interview.

On July 27, 2015, IRS Counsel Blaine issued summons enforcement letters known as "last chance letters" to Brian and Denae noting that legal enforcement proceedings may be brought against them for not complying with the summons, and scheduling a conference for August 19, 2015.  Exhibit JJ.  The last chance letters do not indicate that the civil audit

team had issued the summonses at the request of CI or that the summons interviews were intended to develop the "F2797 CI Referral." Exhibit JJ. The last chance letters do not provide a disclaimer that Brian and Denae may refuse to give any information that may tend to incriminate them pursuant to the Fifth Amendment. IRS Counsel Blaine emailed GM Pardo and indicated that he would pursue summons enforcement if Brian and Denae did not appear. Exhibit KK, at 3.

On August 14, 2015, IRS Counsel Blaine emailed FTA Damodar, RA Raymond, and GM Pardo, asking whether the purpose of his advice was to approve a 90-day letter, or to concur that there is sufficient evidence of fraud to hold open the statute. Exhibit KK, at 1. In his response, FTA Damodar stated that the "request is to concur evidence of fraud to assert the Civil Fraud Penalty and open the statute." In other words, the civil audit team wanted permission to let the three-year statute expire, rather than permission to approve the 90-day letter, so that the civil audit team could continue to "develop the earlier year (201112) and proceed with the F2797 CI Referral." Exhibit Z, at 2.

The distinction between seeking approval of the 90-day letter versus the statute of limitations is important in this case. A 90-day letter is a statutory "notice of deficiency" that must be issued to a taxpayer prior to the assessment of any tax deficiency and related penalties, including the civil fraud penalty. I.R.C. §§ 6212, 6213. Prior IRS Counsel approval is mandatory in any case where the IRS civil fraud penalty is included in a notice of deficiency. IRM 25.1.6.3(17) (06-10-2021). However, IRS Counsel approval is also required for the distinct issue of whether the civil auditor can get permission to continue the audit beyond the normal three-year statute of limitations. IRM 4.8.9.9.2.1(1)(d) (08-11-2016) (burden of proof cases involving the various exceptions to the three-year statute set forth in I.R.C. § 6501(e), including the fraud exception). The civil audit team did not want the 2011 year to be closed out and go to Tax Court, which could hinder development for the criminal investigation, which is why they were so interested in either getting Brian and Denae to sign a statute extension, or to get IRS Counsel approval to allow the three-year statute to expire in reliance on the extended fraud statute.

### F.     Brian and Denae Attend Summons Interview

On August 19, 2015, Brian and Denae appeared for the summons interview.   In attendance at the interview were RA Raymond, GM Pardo, and SEP Group Manager John Yu ("SEP GM Yu").  Black Decl., ¶ 42.  The Tax Court held that "RA Raymond completed the RAR <u>before the August meeting</u>, stating in her internal notes that she intended to discuss the RAR during the meeting." *Beland v. Commissioner*, 156 T.C. 80, 82-83 (2021). Given that RA Raymond had already decided the ultimate tax and fraud penalty, the interview only served the purpose of developing the fraud case for CI.  Similarly, CPA Black said the following about the August 19, 2015, summons interview:

> My impression at this meeting, like the first two meetings, was that the IRS had already made up its mind to disallow the business expense deductions. At the end of this meeting, the IRS gave Brian and Denae the audit report, which RA Raymond had prepared before the meeting. It seemed to me that the summons interview was unnecessary if the IRS had already made up its mind about the tax and fraud penalty for 2011.

Black Decl., ¶ 43.

By providing the pre-printed audit report at the summons interview with the fraud penalty, without GM Pardo's advance written approval, the Tax Court found RA Raymond failed to follow the statutory penalty approval procedure in violation of I.R.C. § 6751(b). *Beland v. Commissioner*, 156 T.C. 80 (2021).  The Tax Court held that the fraud penalty may not be assessed for tax year 2011.

During the interview, RA Raymond asked questions about Brian and Denae's "extent of knowledge concerning certain bank information and other 3rd party records which [the IRS] received from prior summons."  Exhibit X, at 1; Exhibit LL, at 42-55. These are the exact questions that CI instructed the civil audit team to ask at the summons interview.  Exhibit X, at 1.

RA Raymond also asked Brian and Denae once again to sign a statute of limitations waiver.  *Id*.  RA Raymond falsely informed petitioners during the August meeting that they did not have appeal rights at that time given that they had less than 240 days left on the

statute of limitations.  *Beland v. Commissioner*, 156 T.C. 80, 83 (2021).  This was another false statement by RA Raymond aimed at inducing Brian and Denae to agree to a statute extension, which would have allowed the civil audit team more time to develop the case for the criminal fraud referral.  The Tax Court specifically found RA Raymond's statement to be "incomplete and potentially misleading depending on when that statement was conveyed to petitioners during the meeting."  *Id*.  The IRS Counsel attorneys did not deny that RA Raymond made this false statement in the opposition to Brian and Denae's motion for partial summary judgment in the Tax Court proceedings.  Exhibit MM.  Additionally, IRS Counsel attorneys never denied CI's involvement in any of its Tax Court filings.  Exhibit MM.

The IRS interviewed Brian and Denae for five to seven hours.  GM Raymond and GM Pardo's notes from this interview reflect that Brian and Denae were not given warnings at the beginning of the summons interview that the facts developed in the investigation might constitute violations of criminal tax laws.  Exhibit A; Exhibit B.  SEP GM Yu emailed RA Raymond after the interview stating ". . . thanks again for letting me tag along. It was FUN!!"  Exhibit NN.

On September 1, 2015, the IRS mailed a notice of deficiency to Brian and Denae for tax year 2011, asserting a tax deficiency of $68,946.00 and a civil fraud penalty in the amount of $51,709.50.  Exhibit OO.

On September 25, 2015, about a month after the closing conference interview with Brian and Denae, the civil audit team sent the Form 2797 (Referral Report of Potential Criminal Fraud Cases) to CI.  Exhibit  PP, at 3.  CI accepted the case and took over the investigation, but tax year 2011 went to Tax Court.

### G.    Tax Court Proceedings, Search Warrant, and Dismissal of Fraud Penalty

On September 1, 2015, the IRS issued a notice of deficiency to petitioners for tax year 2011.  The notice of deficiency gave Brian and Denae 90 days to file a petition in the U.S. Tax Court.  Brian and Denae filed a petition for redetermination in the Tax Court on

December 3, 2015.  *Beland v. Commissioner*, 156 T.C. 80, 83 (2021).

While Brian and Denae were in the process of negotiating a settlement for tax year 2011 with the IRS Appeals Office in the Tax Court proceedings, CI Special Agents executed a search warrant at their home on June 22, 2016 (Brian and Denae's baby's first birthday).  During the search, a CI Special Agent pointed a gun at their two-year old daughter while she was still in bed.  Exhibit SS (photo of IRS Special Agent pointing firearm at defendants' two-year-old daughter).  The photo shows the daughter sitting up in bed, watching the CI Special Agent enter her room and point a firearm at her.

Following the execution of the search warrant, the IRS and counsel for Brian and Denae filed several motions to continue due to the criminal investigation, and the case was eventually placed on a status report track.

On October 4, 2019, Brian and Denae filed a motion for partial summary judgment contesting the civil fraud penalty.  On March 1, 2021, the Tax Court issued a precedential Division Opinion in *Beland v. Commissioner*, 156 T.C. 80 (2021), granting Brian and Denae's motion and holding that the IRS is prohibited from assessing the civil fraud penalty for 2011.  The Tax Court found that RA Raymond failed to obtain timely supervisory approval of the civil fraud penalty for tax year 2011 in contravention of I.R.C. § 6751(b).  The Court held that "RA Raymond completed the [revenue agent report] before the August meeting, stating in her internal notes that she intended to discuss the [revenue agent report] during the meeting."  *Id*. at 82-83.  As noted above, this fact is important because RA Raymond had already concluded what the tax and penalties would be before she interviewed Brian and Denae on August 19, 2015.

The Tax Court opinion is clear that GM Pardo had issued the summons upon the request of CI, and that the summons was issued "to obtain information concerning petitioners' knowledge as to bank information and third party records."  *Beland v. Commissioner*, 156 T.C. 80, 82 n.2 (2021).  These facts are also important because they reflect that the IRS acted on behalf of CI in serving the summons, and asked questions on specific topics selected by CI.

The Tax Court case remains on a status report track due to the pending criminal proceedings.

## III.   ARGUMENT

This case should be dismissed because the government acted in bad faith in violation of Brian and Denae's Fourth and Fifth Amendment rights.

In *United States v. Kordel*, 397 U.S. 1, 11 (1970), the Supreme Court held that the government may conduct parallel civil and criminal investigations without violating the due process clause, so long as it does not act in bad faith. *See United States v. Stringer*, 535 F.3d 929, 936-937 (9th Cir. 2008). The Supreme Court cautioned against the possible unconstitutionality or impropriety of parallel civil and criminal investigations in certain circumstances: (1) "where the Government has brought a civil action solely to obtain evidence for its criminal prosecution or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution," (2) "where the defendant is without counsel or reasonably fears prejudice from adverse pretrial publicity or other unfair injury," or (3) where there are "other special circumstances that might suggest the unconstitutionality or even the impropriety of [the] criminal prosecution." *United States v. Kordel*, 397 U.S. 1, 12-13 (1970).

The Supreme Court has not had occasion to address such issues since *Kordel*, but lower courts have. *United States v. Stringer*, 535 F.3d 929, 937 (9th Cir. 2008). In "special circumstances" in which the nature of the proceedings demonstrably prejudices substantial rights of the investigated party, parallel investigations may be improper. *SEC v. Dresser Industries, Inc.*, 628 F.2d 1368, 1376-1377 (D.C. Cir. 1980).

While a mere failure of an IRS agent to warn a taxpayer that an audit may have potential criminal ramifications does not render the search unreasonable, an IRS search is unreasonable, even if consensual, if the consent is obtained by trickery, deceit, or misrepresentation of the agent. *United States v. Robson*, 477 F.2d 13, 17-18 (9th Cir. 1973) (citing similar rules in Second, Third, and Fifth Circuits). Likewise, the Seventh Circuit has held that a consensual search is unreasonable under the Fourth Amendment, or

violative of due process under the Fifth Amendment, if the consent was induced by fraud, deceit, trickery, or misrepresentation by the IRS agent. *United States v. Peters*, 153 F.3d 445, 451 (7th Cir. 1998). In *Peters*, the court noted that an affirmative misrepresentation as to the nature of the investigation can be made through both "conduct and words." *Id*. Accordingly, if the agents were in fact conducting a criminal investigation under the auspices of a civil audit, then they affirmatively misrepresented the nature of their investigation. *Id*. Revenue agents were engaged in a covert criminal investigation if they continued to audit defendant after they developed a firm indication of fraud. *Id*.

District courts have suppressed evidence or dismissed indictments on due process grounds where the government made affirmative misrepresentations or conducted a civil investigation solely for purposes of advancing a criminal case. *United States v. Stringer*, 535 F.3d 929, 937 (9th Cir. 2008). In *Stringer*, the Ninth Circuit noted that in a case of "government bad faith," suppression or dismissal of an indictment may be appropriate. *Id*. at 939.

In *United States v. Grunewald*, 987 F.2d 531, 534 (8th Cir. 1993), the court described the issue of parallel civil and criminal investigations as follows:

> It is clear that the IRS may not develop a criminal investigation under the auspices of a civil audit. *See United States v. Meier*, 607 F.2d 215 (8th Cir.1979), *cert. denied*, 445 U.S. 966, 100 S.Ct. 1658, 64 L.Ed.2d 243 (1980); *United States v. Tweel*, 550 F.2d 297 (5th Cir.1977). Significantly different rights, responsibilities, and expectations apply to civil audits and criminal tax investigations. It would be a flagrant disregard of individuals' rights to deliberately deceive, or even lull, taxpayers into incriminating themselves during an audit when activities of an obviously criminal nature are under investigation. *See United States v. Tweel*, 550 F.2d at 299 ('a consent search is unreasonable under the Fourth Amendment if consent was induced by the deceit, trickery or misrepresentation of the Internal Revenue agent'). Therefore, once an IRS agent has developed 'firm indications of fraud' in a civil investigation, the case must be turned over to the CID.

*Id*.

Other courts that have addressed the issue have relied on the "firm indications of fraud" rule as a good benchmark for determining whether the IRS has attempted to conduct

a criminal investigation under the guise of a civil audit.  *Id*. at 451-452, *citing United States v. Wadena*, 152 F.3d 831, 854 (8th Cir.1998) (requiring defendant seeking suppression of evidence to show that IRS continued with civil audit after it developed firm indications of fraud); *Groder v. United States*, 816 F.2d 139, 142 (4th Cir. 1987) (holding that continuation of civil audit after the development of firm indications of fraud is relevant to issue of whether agency conducted investigation in good faith); and *United States v. Piper*, 681 F.Supp. 833, 837 (M.D.Ga.1988) (same).

Evidence gathered for a criminal investigation may be suppressed where it is established that: (1) the IRS had firm indications of fraud by the defendant; (2) there is clear and convincing evidence that the IRS affirmatively and intentionally misled the defendant; and (3) the IRS's conduct resulted in prejudice to defendant's constitutional rights.  *United States v. Grunewald*, 987 F.2d 531, 534 (8th Cir. 1993).  The Sixth Circuit has considered a similar two-part test: (1) the IRS made affirmative misrepresentations in the course of the investigation; and (2) because of those misrepresentations, the defendant disclosed incriminating evidence to the prejudice of his or her constitutional rights.  *United States v. McKee*, 192 F.3d 535, 542 (6th Cir. 1999).  In *McKee*, the court held that a defendant can satisfy the burden under this test, as a practical matter, by showing that the IRS failed to comply with its Internal Revenue Manual provisions, including the requirement that an agent suspend the investigation upon discovery of affirmative acts of evasion.  *Id*. at 542.  While the Internal Revenue Manual generally does not have the force and effect of law, its provisions are, at the very least, relevant in determining whether a taxpayer's constitutional rights have been offended.  *United States v. McKee*, 192 F.3d 535, 540 (6th Cir. 1999); *see Fargo v. Commissioner*, 447 F.3d 706, 713 (9th Cir. 2006).

Several circuits adhere to the view that a conviction may be overturned if the IRS is found to have violated a provision in the Internal Revenue Manual "designed to protect the constitutional rights of taxpayers."  *Id*. at 541, citing *United States v. Horne*, 714 F.2d 206, 207 (1st Cir. 1983) (per curiam), and *United States v. Leahey*, 434 F.2d 7, 10-11 (1st Cir.

1970) (allowing due process claim where a Special Agent failed to give a taxpayer certain warnings as provided in the Manual that he was the subject of a criminal investigation). Similarly, the Seventh and Eighth Circuits have held that a taxpayer may challenge a conviction by relying on the Manual's provisions, so long as the taxpayer's challenge was based on an alleged violation of a constitutional right.  *See United States v. Peters*, 153 F.3d at 451–52 n. 9; *United States v. Grunewald*, 987 F.2d 531, 534 & n. 3 (8th Cir. 1993).

In *United States v. Peters*, 153 F.3d 445, 450 (7th Cir. 1998), the court found that Internal Revenue Manual provisions are relevant in determining whether there has been fraud, deceit, trickery, or affirmative misrepresentations by the revenue agents:

> A consensual search is unreasonable under the Fourth Amendment or violative of the due process clause of the Fifth Amendment if the consent was induced by fraud, deceit, trickery or misrepresentation by the revenue agents. For those elements to be present, the defendant must establish that the agents affirmatively misled her as to the true nature of their investigation and that this affirmative misleading was a material factor in her decision to give information to the agents. With respect to the first factor-whether affirmative misleading took place-we believe, as do the other circuits that have addressed the question, that the 'firm indications of fraud' rule serves a useful function in guiding the district court's inquiry on the ultimate question as to whether there has been a deliberate misleading by the government. The foregoing discussion notes circumstances that, when present, have suggested strongly to reviewing courts that deceit and trickery amounting to such an affirmative misrepresentation have occurred. In identifying such circumstances, courts have viewed with a jaundiced eye the IRS' deviations from its own rules and regulations. That does not mean, of course, that such a deviation is sufficient, standing alone, for exclusion of evidence. *See United States v. Caceres*, 440 U.S. 741, 755-57, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *see also United States v. Mapp*, 561 F.2d 685, 690 (7th Cir. 1977) (holding that rules in Internal Revenue Manual were adopted for the internal administration of the IRS and therefore conferred no substantive rights on the taxpayer). It simply means that such deviations are relevant and probative evidence on the issue of whether the requisite affirmative misleading by the government has in fact occurred.

*United States v. Peters*, 153 F.3d 445, 450 (7th Cir. 1998).

In *Peters*, the court cited to the then-existing Internal Revenue Manual:

If, during an examination, an examiner discovers a firm indication of fraud on the part of the taxpayer, the tax return preparer, or both, the examiner shall suspend

his/her activities at the earliest opportunity without disclosing to the taxpayer, the taxpayer's representative, or employees, the reason for such suspension.

* * *

Therefore, if a revenue agent continues to conduct a civil audit after developing "firm indications of fraud," a court may justifiably conclude that the agent was in fact conducting a criminal investigation under the auspices of a civil audit.

*United States v. Peters*, 153 F.3d 445, 452 (7th Cir. 1998).

Several similar IRM provisions in effect in 2014 and 2015 are relevant because they are designed to protect taxpayer rights. IRM 25.1.2.2(6) provides that if "affirmative acts of fraud" are established: (a) The <u>compliance employee must suspend</u> collection or <u>examination activity</u>, and immediately notify the group manager and the FTA. Ex. BB (emphasis added).

IRM 25.1.2.2(6) provides: "**Warning: The compliance employee or the compliance employee's group manager must *never* seek advice from CI for a specific case under examination/collection activity**." (Bold and italics in original.)

Other IRM provisions have similar instructions designed to protect taxpayer rights against improper civil investigation procedures that should be handled by CI. IRM 4.23.9.6.2(2) (05-14-2008) provides "(2) If an examiner discovers firm indications of fraud, the examination should immediately be suspended without disclosing to the taxpayer the reason for such suspension. Examiners are cautioned not to carry the investigation beyond the point where a valid indication of fraud is adequately supported by the workpapers." IRM 4.71.25.2(16) (3-19-2014) provides "Cases in status 17 must be worked in a timely manner. Under no circumstances should the agent and/or the agent's group manager contact CI at this stage. Such contact may jeopardize the criminal case. See *U.S. v. Tweel, 550 F.2d 297*." IRM 25.5.6.5.2(3) provides: "A third-party collection summons must not be solely used to pursue a criminal investigation. To do so would constitute a subterfuge and would jeopardize the criminal investigation. *See United States v. Tweel*, 550 F.2d 297 (5th Cir. 1977). Using a collection summons solely to further a criminal

investigation would also circumvent the IRC 7609(a) notice requirement if the summons were directed to a third-party record-keeper. The collection employee's purpose for issuing the summons must be to collect the tax, not solely to develop a criminal case."   IRM 25.5.10.4.1.4(2) (01-13-2012) provides "While the case is under consideration for criminal action, do not attempt to enforce obedience with the provisions of the summons."

In 2007, the IRS acknowledged the issue of FTA involvement in developing a criminal case in IRS Chief Counsel Memorandum, "FTA's Role in Civil and Criminal Investigations," available online at https://www.irs.gov/pub/lanoa/pmta01123_7321.pdf (last visited Feb. 7, 2022).  In this memorandum, the IRS noted the underlying concerns:

> It is particularly troubling that almost all of the government's evidence against the McKees was practically handed to the CID on a silver platter as a result of the civil investigation. . . . We recognize that revenue agents are not charged with criminal law enforcement. Nevertheless, as this case exemplifies, the reality is that revenue agents sometimes perform the same functions of evidence gathering as their CID counterparts, and such evidence is often admissible at a criminal trial.

*Citing United States v. McKee*, 192 F.3d 535, 542 (6th Cir. 1999).

As is discussed below, the IRS has acted in bad faith in violation of Brian and Denae's Fourth and Fifth Amendment rights.  First, the IRS engaged in fraud, deceit, trickery, and misrepresentation in gathering documentary and testimonial evidence from Brian and Denae.  Second, the IRS continued the investigation after it had developed affirmative acts of fraud, violating case law prohibiting the IRS from conducting a criminal investigation under the guise of a civil audit, and in violation of the Internal Revenue Manual provisions designed to protect taxpayer rights.  Third, Brian and Denae satisfy the three-part test applied in the Eighth Circuit and other circuits.

### A.   IRS Used Fraud, Deceit, Trickery, and Misrepresentation to Gather Evidence To Incriminate Defendants

In this case, the IRS has acted in bad faith in violation of the defendants' Fourth and Fifth Amendment rights.  *United States v. Peters*, 153 F.3d 445, 451 (7th Cir. 1998).  The civil audit team engaged in fraud, deceit, trickery, and misrepresentation to obtain

28

documentary and testimonial evidence from Brian and Denae and their representative, CPA Black. *Id*. The civil audit team made affirmative misrepresentations about speaking with CPA Prod'hon, and developed a criminal investigation under the auspices of a civil audit which similarly demonstrates misrepresentation (discussed in greater detail in Section III.C, below). *United States v. Peters*, 153 F.3d 445, 451 (7th Cir. 1998).

The IRS affirmatively misled Brian and Denae with respect to its communications with CPA Prod'hon. RA Raymond and GM Drysdale both had discussions with CPA Prod'hon about Brian and Denae's tax returns. When Brian and Denae requested a list of third-party contacts pursuant to I.R.C. § 7602(c)(2), the civil audit team falsely stated in a Letter 3173 that the only third-party contact was New Dimensions, Inc. Exhibit U. This letter was a material misrepresentation that substantially prejudiced Brian and Denae's rights. Brian and Denae lost an important opportunity to seek legal counsel or otherwise determine how to proceed given that the IRS had discussed confidential and privileged information with a key witness. CPA Black stated that had he known about this contact, he would have referred Brian and Denae to an attorney:

> Had the IRS informed me in the February 27 letter that RA Raymond or one of the group managers had spoken with CPA Prod'hon, I would have advised Brian and Denae that the IRS had likely received confidential and privileged information about their tax returns, and I would have referred them to an attorney. I previously had a business partner who was an attorney, so over the years I have become sensitive to situations where an attorney should be consulted or engaged.

Black Decl., ¶ 30.

The IRS used deceit and trickery to conceal the communications with CPA Prod'hon. To help ensure that the discussion would not be discovered, FTA Damodar instructed RA Raymond and GM Drysdale not to write a memo for the case file regarding the discussions. GM Drysdale had planned on writing a memorandum of interview to memorialize that conversation, but followed FTA Damodar's instruction. FTA Damodar was concerned that Brian and Denae would discover the communication in the subsequent Tax Court proceeding, stating that "I believe if it goes to tax court, the CPA will be

summonses [sic] to testify."  Exhibit R.  The intentional decision not to record a witness interview is a substantial departure from normal IRS practice and is in violation of IRM provisions requiring documentation of all interviews.  IRM 4.10.3.3.5(3) (02-26-2016) (requiring interviews to be documented in a memorandum of interview); *see also* IRM 4.16.1.3.2 (06-14-2011).

Not only did the IRS intentionally decide not to create a memorandum of interview with CPA Prod'hon, RA Raymond studiously avoided mentioning her anywhere in the civil audit file despite the civil audit team's discussion with her.  Exhibit B.  Instead, the civil audit team kept CPA Prod'hon's identity out of the civil administrative file, and then immediately provided her information to CI once the criminal referral was formally opened.  GM Drysdale kept post-it notes from the discussion in a secret location outside of the civil audit file, and then turned the notes over to CI after the civil audit had concluded.  Exhibit S.  The IRS considered CPA Prod'hon's statements to be significant, and CI used the wording from the post-it notes verbatim in the search warrant application (alleging that Brian and Denae "came up with" the figures).  Exhibit S.

Similarly, at the first interview with Brian and Denae, RA Raymond stated that the IRS would "not disclose to anyone the information you give us."  Ex. LL, at 21.  This misleading statement gave Brian and Denae a false sense of security that they would be dealing directly with RA Raymond and not working with unknown CI Special Agents behind the scenes.

Unlike the SEC's comments about the possibility of a criminal prosecution in *United States v. Stringer*, the IRS misrepresentation about its third-party contacts was not "appropriate and truthful."  *United States v. Stringer*, 535 F.3d 929, 938 (9th Cir. 2008).  When CPA Black became concerned about how the civil audit was going, he asked the IRS who it had contacted.  The IRS falsely stated that it had only one contact: New Dimensions, Inc.  Exhibit U; Exhibit T.  RA Raymond did not complete a Form 12175 (Third-Party Contact Report Form) or write a memorandum of interview regarding the discussion with CPA Prod'hon as required by the Internal Revenue Manual.  Exhibit QQ.  Instead, she

emailed the IRS third-party contact coordinator George Pritchard and told him there had only been one third-party contact. Exhibit T. It is outrageous that FTA Damodar instructed the civil audit team not to put in writing the conversation with CPA Prod'hon as GM Drysdale had otherwise planned to do. This was a violation of the Internal Revenue Manual and clearly demonstrates bad faith. IRM 4.10.3.3.5(3) (02-26-2016) (requiring interviews to be documented in a memorandum of interview); *see also* IRM 4.16.1.3.2 (06-14-2011).

The IRS's conscious and successful effort to conceal this significant witness from Brian and Denae, on its own, is a departure from civil audit procedures, and clearly demonstrates that the IRS planned to deceive Brian and Denae. Thus, the IRS induced Brian and Denae to cooperate in the civil audit through fraud, deceit, trickery, and affirmative misrepresentations, which renders the search unreasonable under the Fourth Amendment and violative of due process under the Fifth Amendment. *United States v. Peters*, 153 F.3d 445, 451 (7th Cir. 1998).

The IRS also made false statements to pressure Brian and Denae to sign a statute extension (Form 872). RA Raymond misrepresented the consequences of their refusal to sign the statute extension, and told Brian and Denae on two separate occasions that they had no appeal rights in an effort to convince them to consent to a statute extension. Exhibit M; *Beland v. Commissioner*, 156 T.C. 80, 89 (2021). The Tax Court was concerned with this statement and found it to be "potentially misleading." *Beland v. Commissioner*, 156 T.C. 80, 89 (2021). RA Raymond also indicated that no new information would be considered on appeal, another false statement aimed at pressuring Brian and Denae to sign the statute extension and provide arguments or information they otherwise may not have provided for fear it could not be raised on appeal. Exhibit M. CPA Black's impression from these false statements was "that RA Raymond was saying these things to pressure Brian and Denae to sign the Form 872 for tax year 2011." Black Decl., ¶ 24.

While Brian and Denae declined to sign the statute extension, this further evidences the IRS's bad faith during the civil audit. But as is discussed in Section III.C, below, the

false statements concerning the statute extension are relevant to establishing that the IRS was conducting a criminal investigation under the guise of a civil audit, and was otherwise conducting the civil audit in bad faith.

In summary, the IRS acted in bad faith by concealing its key witness, CPA Prod'hon. The IRS concealed the conversation with CPA Prod'hon by failing to record the conversation in a memorandum of contact, and then did not disclose her when CPA Black requested a list of all third-party contacts. The IRS's bad faith is further evidenced by RA Raymond's false statements to Brian and Denae regarding the consequences of their failure to agree to a statute extension. This case should be dismissed due to the civil audit team's fraud, deceit, trickery, and affirmative representations.

### B. IRS Civil Agents Continued Investigation After Developing Affirmative Acts of Fraud Instead of Referring Case to Criminal Investigation Division

When the civil audit team had what it considered to be "affirmative acts of fraud," it failed to suspend the audit and instead sought advice directly from CI for a specific case under examination in violation of Fourth and Fifth Amendment case law, the Internal Revenue Manual, and Form 205 (Fraud Development Lead Sheet). *United States v. McKee*, 192 F.3d 535, 542 (6th Cir. 1999).

The IRS continued its investigation solely for the purpose of advancing the criminal case long after the civil audit team had developed facts they considered to be firm indicators of fraud or affirmative acts of fraud. Based upon the IRS statements and conduct at the first meeting in December 2014, CPA Black stated that, "It was absolutely clear to me at the initial meeting that the IRS had already made up its mind to disallow the business expense deductions." Black Decl., ¶ 17. This is corroborated by RA Raymond's fraud development referral, which she initiated the same day as the first appointment with CPA Black by reaching out to FTA Damodar. Exhibit B; Exhibit J. On her Form 11661, RA Raymond stated that there were "false expenses/deductions, and in her notes she stated that Brian and Denae had been "uncooperative throughout the audit." Exhibit J; Exhibit L.

Regarding the meeting in January 2015, CPA Black stated that, "Like the first meeting, it was obvious to me from the IRS statements and behavior that the IRS had already made up its mind and would disallow the business expense deductions."  Black Decl., ¶ 23.

By February 2015, the civil audit team had already begun emailing each other about Title 26 criminal tax violations.  Exhibit Q (emails between FTA Damodar and civil audit team).  These contemporaneous admissions show that the civil audit team was clearly planning to develop the criminal case.

By April 2015, FTA Damodar stated that there were several "affirmative acts of fraud" in an email to IRS Counsel.  Exhibit X, at 4 (email from FTA Damodar to IRS Counsel dated 4/8/2015).  Before the summons interview, FTA Damodar again stated that "[t]he affirmative act of fraud is the taxpayer continues to maintain they have a right to file a Schedule C by providing false statements."  Exhibit KK, at 6.

The civil audit team had concluded that they would disallow the business expenses, which they considered to be false expenses, and asserting the fraud penalty before the summons interview.  By June 2015, GM Pardo was already content for purposes of the civil case to simply disallow all of Brian and Denae's business expenses and issue an audit report with fraud penalties.  Black Decl., ¶ 37; Exhibit HH.  Despite that conclusion, GM Pardo expressed his preference to allow the assessment statute to expire so that his team could "continue to develop the earlier year (201112) and proceed with the F2797 CI Referral."  Exhibit Z, at 2.

RA Raymond similarly wanted more time to gather information for CI, and falsely stated to Brian and Denae on two separate occasions that they had no appeal rights in an effort to convince them to consent to a statute extension.  Exhibit M, at 2-3; *Beland v. Commissioner*, 156 T.C. 80, 89 (2021).  The Tax Court was concerned with this statement and found it to be "potentially misleading."  *Beland v. Commissioner*, 156 T.C. 80, 89 (2021).

Additionally, before the final summons interview, RA Raymond had already made up her mind about the tax and fraud penalty, and presented Brian and Denae with an audit report with the tax and the fraud penalty for tax year 2011 that she had prepared before the meeting. *Id*. at 82-83. CPA Black stated that this meeting was unnecessary given that the IRS had already made up its mind about the deductions and the fraud penalty:

> My impression at this meeting, like the first two meetings, was that the IRS had already made up its mind to disallow the business expense deductions. At the end of this meeting, the IRS gave Brian and Denae the audit report, which RA Raymond had prepared before the meeting. It seemed to me that the summons interview was unnecessary if the IRS had already made up its mind about the tax and fraud penalty for 2011.

Black Decl., ¶ 43.

In summary, the civil audit team had already determined that there were "affirmative acts of fraud" by their own admission in April 2015. Their internal emails in February 2015 reflect that they were developing Title 26 criminal tax violations. The civil audit team continued to investigate the case as a criminal matter, by its own admission, in order to "proceed with the F2797 CI Referral," which demonstrates that the team had what they considered affirmative acts of fraud but failed to suspend the civil investigation.

## C.   IRS Agents Conducted a Criminal Investigation Under the Guise of a Civil Audit

As the Eighth Circuit noted in *Grunewald*, "[i]t is clear that the IRS may not develop a criminal investigation under the auspices of a civil audit." *United States v. Grunewald*, 987 F.2d 531, 534 (8th Cir. 1993). CI had direct involvement in the development of the case. Not only did GM Pardo acknowledge that the civil audit team was working on the CI referral, but he actually admitted that his team had taken orders from CI Special Agents.

As the Tax Court has already held, GM Pardo admitted that the civil audit team served the administrative summonses on Brian and Denae "[u]pon the request of the IRS Criminal Investigation Division . . . ." *Beland v. Commissioner*, 156 T.C. 80, 82 (2021). The Tax Court also acknowledged that the summons was issued "to obtain information concerning petitioners' knowledge as to bank information and third-party records." *Id*. at

34

n.2.  The civil audit team clearly acted at the direction of CI in this case in order to obtain information from Brian and Denae that they would not have provided had they known this was in reality a criminal investigation.  CPA Black noted that he would have referred Brian and Denae to an attorney had he known CI was involved:

> 33. I was not aware that the IRS Criminal Investigation Division ('CI') had already become involved at this stage. I did not know that a CI Special Agent or Special Agents had instructed RA Raymond and GM Pardo to serve the summonses in order to get certain testimony from Brian and Denae.

> 34. It was my understanding at the time that the IRS was required to inform taxpayers if an audit had become a criminal investigation. Had I known that CI was involved, I would have instructed Brian and Denae to hire an attorney.

Black Decl., ¶¶ 33-34.

During the summons interview, the IRS asked questions about the topics that CI had specifically instructed the civil audit team to ask about: "to obtain information concerning petitioners' knowledge as to bank information and third party records."  *Id*. at n.2.  The IRS notes from the interview reflect that the interview questions related to third-party summons documents the IRS had obtained from Wells Fargo Bank, Bank of America, New Dimensions, and Costco.  Exhibit  LL, at 42-53.

In addition to CI's direct involvement in the decision to issue the administrative summons and the questions to be asked at the summons interview, the IRS's internal emails discussed above serve as contemporaneous evidence of the civil audit team's intent to investigate criminal violations.  In February 2015, the civil audit team was emailing with the subject line "Title 26 Criminal Violation."  Exhibit Q.  The civil audit team specifically discussed violations of I.R.C. § 7205.  A few months later, GM Pardo admitted in an email that they had received instructions about the summons interview from CI.  Exhibit X.  GM Pardo even admitted that his team had been investigating on behalf of CI by working on the "F2797 CI Referral."

The IRS must not develop a criminal investigation under the auspices of a civil audit, and this case should be dismissed on this basis.

**D.    Grunewald Test Also Demonstrates Government Conducted the Civil Audit In Bad Faith In Violation of Defendants' Fourth and Fifth Amendment Rights**

The case should similarly be dismissed if we apply the three-part test laid out in *United States v. Grunewald*, 987 F.2d 531 (8th Cir. 1993) and other circuits: (1) the IRS had firm indications of fraud; (2) there is clear and convincing evidence that the IRS affirmatively and intentionally misled the defendants; and (3) the IRS's conduct resulted in prejudice to defendants' constitutional rights.

First, the IRS believed there were firm indications of fraud in this case almost from the outset of the audit.  RA Raymond formally opened up fraud development procedures in December 2014 before she ever met with Brian and Denae and alleged that there were "false expenses/deductions," that Brian and Denae had been "uncooperative throughout the audit," and that they had deducted "fabricated expenses."  Exhibit J; Exhibit L.  By April 2015, FTA Damodar stated in an email that he believed there were "several affirmative acts of fraud."  Exhibit X, at 4.  Again in July 2015, FTA Damodar stated that "[t]he affirmative act of fraud is the taxpayer continues to maintain they have a right to file a Schedule C by providing false statements."  Exhibit KK, at 6.  The IRS is careful about fraud terminology, and distinguishes between "first indicators of fraud" on the one hand, and "firm indicators of fraud" or "affirmative acts of fraud" on the other, noting that "[a]ffirmative acts of fraud are those actions that establish that a particular action was deliberately done for the purpose of deceit, subterfuge, camouflage, concealment, some attempt to color or obscure events, or make things seem other than what they are."  IRM 25.1.1.4 (04-22-2021).  FTA Damodar admitted that his team considered there to be "several affirmative acts of fraud" by April 2015 and again in July 2015.  The IRS also prepared the final audit reports disallowing the business expenses and asserting the civil fraud penalties over a month before the August 19, 2015, summons interview.  Exhibit B, at 18.  After the IRS finished the summons interview, RA Raymond handed Brian and Denae a copy of the audit report for tax year 2011.  *Beland v. Commissioner*, 156 T.C. 80, 82-83 (2021).  CPA Black stated that "[i]t seemed to me that the summons interview was

unnecessary if the IRS had already made up its mind about the tax and fraud penalty for 2011." Black Decl., ¶ 43. The civil audit team had what they considered to be clear indications of fraud early in the civil audit.

Second, there is clear and convincing evidence that the IRS affirmatively and intentionally misled Brian and Denae. The IRS had spoken with CPA Prod'hon about Brian and Denae's tax returns, and she purportedly told the IRS that Brian and Denae "came up with" the figures on their tax returns. When Brian and Denae asked who the IRS had spoken with in February 2015, the IRS falsely stated that the only third-party contact had been with New Dimensions, Inc. Exhibit U. FTA Damodar talked GM Drysdale out of writing a memorandum of interview concerning his discussion with CPA Prod'hon. Instead, GM Drysdale kept his handwritten post-it notes from the conversation outside of the civil file and ultimately turned them over to CI. The language contained on the post it notes ("came up with") appeared verbatim in the search warrant application. By the IRS's own admissions, they were working on behalf of CI by developing the "F2797 CI Referral." Exhibit Z, at 2. The IRS issued the summons for Brian and Denae to appear "[u]pon the request of the IRS Criminal Investigation Division" in order to "obtain information concerning [Brian and Denae's] knowledge as to bank information and third party records." *Beland v. Commissioner*, 156 T.C. 80, 82 (2021). All of this conduct served to mislead Brian and Denae into appearing for interviews and producing documents the IRS intended to use to incriminate them in a criminal case. Where IRS agents are in fact conducting a criminal investigation under the auspices of a civil audit, a court may justifiably conclude that they have affirmatively misrepresented the nature of their investigation. *United States v. Peters*, 153 F.3d 445, 451 (7th Cir. 1998).

As is noted above, RA Raymond stated to Brian and Denae that the IRS would "not disclose to anyone the information you give us." Ex. LL, at 21. This misleading statement gave Brian and Denae a false sense of security that they would be dealing directly with RA Raymond and not working with unknown CI Special Agents behind the scenes.

37

Third, the IRS's conduct resulted in prejudice to Brian and Denae's constitutional rights. Had Brian and Denae known about the IRS's discussion with CPA Prod'hon about their tax returns, or had they known that the IRS was working at the direction of CI, they would have had the opportunity to engage an attorney or invoke their Fifth Amendment rights. Instead, Brian and Denae appeared for the summons interview and offered testimony on topics that CI specifically asked for. Unlike *United States v. Stringer*, the IRS did not advise Brian and Denae before the summons interview that they could invoke their Fifth Amendment privilege during that interview. In *Stringer*, the SEC provided a Form 1662 to the defendant in advance of the subpoena interview a Fifth Amendment disclosure under the heading "Fifth Amendment and Voluntary Testimony":

> Information you give may be used against you in any federal ... civil or criminal proceeding brought by the Commission of any other agency. You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment of the Constitution of the United States, to give any information that may tend to incriminate you or subject you to fine, penalty, or forfeiture.

*Stringer*, 535 F.3d at 934-935.

In contrast, after the IRS personally served the summons on Brian and Denae, IRS Counsel Blaine took the additional step of threatening to enforce the summons in district court after Denae had to reschedule as she had just given birth a few days prior. Exhibit JJ; Exhibit KK, at 3. The IRS characterized these procedures as compelling Brian and Denae to appear "by force." Exhibit N. There was no indication that Brian and Denae should have considered invoking their Fifth Amendment rights based upon the language in the summonses and the last chance letters. CPA Black stated that "[h]ad the IRS informed me in the February 27 letter that RA Raymond or one of the group managers had spoken with CPA Prod'hon, I would have advised Brian and Denae that the IRS had likely received confidential and privileged information about their tax returns, and I would have referred them to an attorney," and "[h]ad I known that CI was involved, I would have instructed Brian and Denae to hire an attorney." Black Decl., ¶¶ 30, 34. Accordingly, the IRS conduct in the civil audit resulted in prejudice to Brian and Denae's rights.

Each of the three *Grunewald* factors has been satisfied in this case: (1) the IRS had firm indications of fraud; (2) there is clear and convincing evidence that the IRS affirmatively and intentionally misled the defendants; and (3) the IRS's conduct resulted in prejudice to the defendants' constitutional rights.  This test is simply another means of establishing that the IRS acted in bad faith, and this case should be dismissed on this basis.

### E.   IRS Violated Provisions of the Internal Revenue Manual and Other IRS Guidance Designed to Protect Constitutional Rights of Taxpayers

The IRS violations of the Internal Revenue Manual are relevant in this case because the applicable provisions are designed to protect the constitutional rights of taxpayers. *United States v. Peters*, 153 F.3d 445, 450 (7th Cir. 1998).  The IRS was required to stop the civil investigation and turn the investigation over to CI upon recognizing firm indications of fraud or "affirmative acts of fraud."  Exhibit BB.  As discussed above, the civil audit team was of the view that there were "affirmative acts of fraud" at least by February 2015, when FTA Damodar admitted that there were "several affirmative acts of fraud."  He admitted this again in a July 2015 email.  Similarly, RA Raymond and GM Pardo had concluded that the deductions would be disallowed and the fraud penalty would apply before the August 2015 summons interview.  By failing to stop the examination and refer it to CI, the civil audit team violated the IRM.

The IRS also violated the IRM by getting advice directly from CI as to how to develop the case.  Exhibit BB.  These concepts regarding the line between civil and criminal case development appear throughout the IRM.  For example, IRM 4.71.25.2 (11-22-2019) provides, "Cases in status 17 [fraud development] must be worked in a timely manner. Under no circumstances should you or your manager contact CI at this stage. Such contact may jeopardize the criminal case. *See U.S. v. Tweel*, 550 F.2d 297."  Yet GM Pardo admitted that the civil audit team did exactly this.  Similarly, IRM 4.32.2.7.6 (06-04-2018) provides "Examiners must not mislead the promoter regarding the existence of a criminal investigation nor conduct a criminal investigation under the guise of the civil investigation.

See *United States v. Tweel*, 550 F.2d 297 (5th Cir. 1977). Refer to IRM 25.1, *Fraud Handbook*, for further information."

The IRM also required that RA Raymond include in her workpapers "All information critical to the case or that supports an adjustment must be included in the paper case file, including lead sheets, supporting workpapers and any other pertinent documents." IRM 4.10.9.7.7(1) (08-11-2014). This includes witness interviews or discussions. The IRM also states that "[i]f the civil fraud penalty is pursued and developed, the examiner must use Lead Sheet 205, Fraud Development, to document the facts, law, and taxpayer's position." IRM 4.10.9.7.9(3) (08-11-2014). RA Raymond did use Lead Sheet 205 in this case, which also instructed her to suspend examination activity.

Incredibly, RA Raymond chose to omit the meetings with CPA Prod'hon from the Activity Record and Lead Sheet 205, along with all other workpapers. Such a failure can only be explained by a conscious effort to conceal the existence of the discussions with CPA Prod'hon, an instrumental witness featured prominently in the search warrant application. Further, apparently GM Drysdale failed to record the meeting with CPA Prod'hon in a memorandum of interview as required by IRM 4.10.3.3.5(3) (02-26-2016) (requiring interviews to be documented in a memorandum of interview). *See also* IRM 4.16.1.3.2 (06-14-2011). Instead, GM Drysdale kept post-it notes that he had maintained in an undisclosed location separate from the civil audit file and not contained in any Activity Record. This concealment was a conscious decision by FTA Damodar to instruct RA Raymond to omit any formal record of the Prod'hon meeting. Hiding this interview and contact from Brian and Denae prejudiced their constitutional rights. FTA Damodar's own words sum it up: "I would not advise to have a memo regarding the discussion." Exhibit R.

In summary, the civil audit team's violations of the IRM resulted in prejudice to Brian and Denae's constitutional rights, and serve as an independent basis to dismiss this case.

## IV.   CONCLUSION

Sections III.A through III.E, above, all relate to the central issue in this case: that the IRS conducted the civil investigation in bad faith in violation of Brian and Denae's Fourth and Fifth Amendment rights.  That bad faith is apparent in several ways: (1) the IRS utilized fraud, deceit, trickery, and misrepresentation; (2) the IRS continued to develop the case after the IRS believed it had already found "affirmative acts of fraud"; (3) the IRS conducted a criminal investigation under the guise of a civil audit; and (4) the IRS violated the Internal Revenue Manual and other internal instructions (*e.g.*, Form 205) that were designed to protect taxpayer rights.

In light of the above, this case should be dismissed with prejudice.  In the alternative, all evidence gathered by the IRS after November 2014 should be suppressed.


Dated: February 28, 2022          LAW OFFICES OF DAVID D. FISCHER, APC


                                  By: /s/ David D. Fischer
                                     DAVID D. FISCHER
                                     Attorney for Defendant
                                     DENAE A. BELAND


Dated: February 28, 2022          /s/ David W. Dratman
                                     DAVID W. DRATMAN
                                     Attorney for Defendant
                                     BRIAN D. BELAND